1 TRACY L. WILKISON
United States Attorney
2 SCOTT M. GARRINGER
Assistant United States Attorney
3 Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
4 KATHY YU (Cal Bar No.  268210)
Assistant United States Attorneys
5 Violent and Organized Crime Section
     1300 United States Courthouse
6     312 North Spring Street
     Los Angeles, California 90012
7     Telephone:    (213) 894-2624/2431
     Facsimile:    (213) 894-0141
8     E-mail:        chelsea.norell@usdoj.gov
                     kathy.yu@usdoj.gov
9
Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                 UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,              No. CR 21-00046-SB

14            Plaintiff,                  GOVERNMENT'S TRIAL
                                          MEMORANDUM
15            v.

16 BARRY BRYANT ROSSMAN,                  Indictment: February 16, 2021

17            Defendant.                  Pretrial Conference: May 10, 2022
                                          Trial: May 24, 2022
18                                        Last Day: November 5, 2022

19

20       Plaintiff United States of America, by and through its counsel of record, the

21 United States Attorney for the Central District of California and Assistant United States

22 Attorney Kathy Yu hereby submits its Trial Memorandum.

23       This Trial Memorandum is based upon the attached memorandum of points and

24 //

25 //

26

27

28

authorities, the files and records in this case, the in-person meet and confer meeting

between government and defense counsel on April 28, 2022, and such further evidence

and argument as required by the Court.

Dated: May 4, 2022                    Respectfully submitted,

                                      TRACY L. WILKISON
                                      United States Attorney

                                      SCOTT M. GARRINGER
                                      Assistant United States Attorney
                                      Chief, Criminal Division


                                            /s/
                                      KATHY YU
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   STATUS OF THE CASE**

Trial is this case is set for May 24, 2022.  The estimated time for the government's case-in-chief is one to two days, during which the government anticipates calling approximately ten witnesses.  Defendant Barry Bryant Rossman ("defendant") is released on bond pending trial.

The parties have submitted a joint statement of the case, joint jury instructions, and a joint verdict form.  At this time, the parties do not believe there are major evidentiary issues and have agreed to meet and confer in the future regarding exhibits to be used in opening statements (if any), summary charts, and other issues.  Two motions in *limine* – the defendant's motion to exclude the government's grooming expert (Dkt. No. 42) and the government's motion to introduce 404(b) evidence (Dkt. No. 43, 49) – are pending with the Court.  Third-party County of Ventura has filed a motion to quash or a motion for protective order regarding the trial testimony of Brian Palmer (Dkt. Nos. 53, 58, 60), which will be heard at the Pre-Trial Conference.

The parties discussed a procedure regarding the handling of child sex abuse material (page 14 *infra*), subject to the Court's approval.

The parties previously proposed certain trial procedures in light of COVID-19, including having voir dire take place in the ceremonial courtroom, and the use of three alternates (Dkt. No. 37), again, subject to the Court's approval and continuing guidance from the Centers for Disease Control and Prevention, Los Angeles County, the State of California, and the Central District of California .

**II.   SUMMARY OF DEFENDANT'S CONDUCT**

In December 2019, defendant, then 60 years old, posed as "Ben," a 21-year-old, and used Instagram account "itsben6969" to contact a 10-year-old girl in Colorado ("victim A.C.") to entice her to send him sexually explicit images of herself. In response to defendant's enticement, victim A.C. sent defendant several photographs, including at least three photos showing her naked genitals.

1    The vast majority of IP addresses used to access "itsben6969" were subscribed to

2  defendant and defendant's deceased mother at defendant's known address in Oxnard,

3  California. Provider records show that the Instagram account was accessed from

4  defendant's IP address at the same time messages were sent to victim A.C.

5    Upon executing a search warrant at defendant's residence, agents found further

6  indicia of defendant's use of the account on defendant's iPhone and laptop computer,

7  including images from the "itsben6969" profile, remnants of chats on defendant's

8  computer, and stored login information on defendant's phone. Evidence from

9  defendant's phone shows that he used Google Translate to translate the same phrases he

10 used to entice victim A.C. into multiple languages, indicating that he solicited victims

11 internationally. A search warrant on defendant's Instagram account revealed that he

12 attempted to entice thousands of potential victims on Instagram, more than 200 of whom

13 told defendant they were minors.

14 **III.   SUMMARY OF CHARGES**

15    For defendant's crimes, on February 16, 2021, a grand jury returned an indictment

16 charging defendant with Production of Child Pornography, in violation of 18 U.S.C.

17 §§ 2251(a)(e) (carrying a 15-year mandatory minimum sentence, and a 30-year

18 maximum sentence); Enticement of a Minor to Engage in Criminal Sexual Activity, in

19 violation of 18 U.S.C. §§ 2422(b) (carrying a 10-year mandatory minimum sentence, and

20 a maximum life sentence); and Receipt of Child Pornography in violation of

21 §§ 2252A(a)(2)(A) (carrying a 5-year mandatory minimum sentence, and a 20-year

22 maximum sentence).

23 **IV.   THE GOVERNMENT'S CASE**

24    **A.   Statement of Facts**

25       1.   Defendant Induces 10-Year-Old Victim to Create Child Pornography

26    In December 2019 and continuing to January 1, 2020, defendant, then 60 years

27 old, posed as "Ben," a 21-year-old, and used Instagram account "itsben6969" to contact

28 victim A.C., a 10-year-old girl in Colorado, to entice her to send him images of her

1   naked body in sexual poses.  When defendant first contacted victim A.C., he pretended

2   to have a 13-year-old brother who had mischievously taken his phone and reached out to

3   victim A.C..  Then defendant, posing as 21-year-old "Ben," apologized for disturbing

4   victim A.C., but added that she had "cute pics" (the "Little Brother Ruse").  Those "pics"

5   were presumably victim A.C.'s profile photograph and publicly accessible photographs,

6   which depicted victim A.C.

7        Defendant continued the conversation, flattering victim A.C. by calling her

8   "cutie," telling her how "sweet" she was, and discussing kid-friendly topics like what

9   "Santa" brought them and New Year's Eve plans. Intermixed with these seemingly

10  innocuous topics, defendant began referring to himself as "naughty" or "a bit naughty

11  but never rude." When victim A.C. told defendant that she was sick, defendant replied,

12  "Awe I'm sorry I hope you feel better soon," and victim A.C. thanked him. Defendant

13  replied, "Welcum," which he explained to a 404(b) Victim (in a separate chat) is his

14  "naughty" way of spelling "welcome," referring to ejaculation. If the government's

15  grooming expert is permitted to testify, he is expected to explain that socializing sexual

16  concepts and innuendo is part of desensitizing a child and preparing them to be

17  exploited.

18       Before mentioning anything sexually explicit, defendant told victim A.C., "I'm

19  surprised your parents are letting you chat with me. I'm quite naughty." The

20  government's grooming expert would explain that it is common for a child sex offender

21  to make statements or ask questions to elicit the minor's level of supervision to assess

22  the risk of being exposed. Defendant made similar statements to the 404(b) Victims,

23  demonstrating both his knowledge that he was speaking to minors and his intent to entice

24  minors to create CSAM without getting caught.

25       In response to defendant telling her he was "naughty," victim A.C. wrote, "Lol I

26  can be naughty to [sic] sometimes," to which defendant replied, "Ide [sic] have to see

27  that." Defendant soon thereafter sent victim A.C., "Naughty kisses." Intermixed with the

28  "naughty" talk, defendant and victim A.C. also discussed their favorite animals and

siblings, which is consistent with the trust building and information gathering stages of grooming, as the government's expert would establish. Defendant sent victim A.C. a photograph of his "little brother," writing, "I might have a pic of my little brother on here. Most of my pictures are all a bit naughty private pics. I show you my little brother if I have a pic," which, understood with the grooming framework, is defendant's way of introducing and normalizing the concept of exchanging sexually exploitative photographs. Defendant also wrote to victim A.C., "Naughty thoughts shame on me."

Later, when victim A.C. told defendant that she had to take a bath, defendant told her, "I wanna be there.  Make room for me." Victim A.C. replied, "maybe I'll send you some pics," to which defendant responded, "Hell ya." Victim A.C. then sent defendant a photograph of her nude chest, and defendant replied, "Beautiful." Defendant escalated the sexual nature of the exchange by sending a photograph of an erect penis. Victim A.C., in turn, sent two photographs of her prepubescent vagina, one seemingly taken from the bathtub.  Defendant responded approvingly, writing, "Beautiful pictures." Defendant told victim A.C., "I would love to have sex with you. Very beautiful pussy." Victim A.C. asked defendant if they could be "boyfriend and girlfriend," to which defendant agreed and told victim A.C. that he loved her. Defendant leveraged this "relationship" to extract more CSAM, telling victim A.C., for example, "I want to watch you play with your pussy," and sending her penis masturbation videos to encourage her to reciprocate. To defendant's advances, victim A.C. appeared to reply enthusiastically, complying with his requests and offering to send additional videos. She told defendant that she loved him and asked him to send videos of himself, mimicking his requests of her. If permitted, the grooming expert would explain that for some victims, the use of grooming can result in the development of romantic or amorous feelings toward the offender, and can instill a fear that the attention and flattery will cease if the minor is no longer compliant. This limited testimony regarding the impact of grooming will assist the jury in understanding victim A.C.'s counterintuitive responses and understand how seemingly willing participation resulted from defendant's enticement.

4

After victim A.C. and defendant exchanged photographs, videos, and messages, defendant instructed victim A.C. to delete her messages, claiming that his little brother might get into his Instagram account and defendant did not want his little brother "loving" the photos like defendant did. Shortly thereafter, victim A.C.'s mother discovered the messages on victim A.C.'s phone and called the police.

### 2.    FBI Identifies Defendant as the User of "itsben6969"

FBI agents identified defendant as the likely user of "itsben6969" based on the IP addresses used to access the account, which were subscribed to defendant and defendant's deceased mother at an address in Oxnard, California. Provider records showed that at the time "itsben6969" sent messages to Victim on December 30 and 31, 2019, and January 1, 2020, the account was accessed from defendant's IP address.

On May 27, 2020, FBI agents executed a search warrant at defendant's mobile home in Oxnard, California. They seized defendant's iPhone and laptop, among other things. On defendant's iPhone, agents found (1) a keychain file[1] showing that the phone was used to access the "itsben6969" Instagram account; (2) images visually identical to those "Ben" sent to Victim portraying "Ben" and his "little brother"; (3) an identical penis image that "itsben6969" sent to Victim; and (4) two images of women that were on the "itsben6969" profile page. On defendant's laptop, agents found (1) artifacts of Instagram chats for "itsben6969" with other females who appeared to be minors; and (2) two images of women that were on the "itsben6969" profile page.

Additionally, on defendant's iPhone, agents exported defendant's search history, which showed that he used Google Translate to translate certain identical and similar phrases that he used with victim A.C. ("I'm 21. My little brother is 13,"; "all of my pictures are private pictures. I enjoy exchanging private pictures and videos"; "I love naughty girls"; "Im a bit naughty I guess"; and "show me your beautiful pussy"), strongly indicating that defendant was victimizing children internationally.

---

[1] A keychain file is an encrypted file on a phone that stores login information for various applications from the first time the phone is used to login to those applications.

5

3.  Instagram Search Warrant Reveals Defendant Contacted More than 6,000 Persons on Instagram, Many of Whom Appear to Be Minors

On January 28, 2020, the Honorable Paul Abrams, issued a search warrant for defendant's Instagram account. The warrant results show that "itsben6969" was created on February 22, 2019, using defendant's phone number. That same day, defendant made 74 contacts, typically sending an emoji and sometimes following up with the Little Brother Ruse. He used the account nearly every day, on average making 16 contacts per day, until the account was closed in late January 2020. Defendant used the Little Brother Ruse approximately 1,633 times, even translating it into other languages to target international victims.

Approximately 224 of Rossman's contacts provided their age, and approximately *90 percent* of the contacts wrote that they were 17 years old or younger, with the average age given as 13 years old, and the most frequent ages provided as 11, 12, and 13, which account for 60 percent of the ages given.

Of the thousands of chats found on the "itsben6969" account, the government proposes introducing three chats that are probative of defendant's identity and use of the "itsben6969" account, and four chats that are probative of defendant's intent, motive, knowledge, absence of mistake, preparation, and plan, which are identified in the government's under seal filing.

First, in the three proposed "identity" chats, the user of "itsben6969" gave the 404(b) Victims different identifying information that together tends to show defendant used that account, including (1) his phone number, which the government believes is linked to defendant; (2) his hometown of Santa Rosa, where defendant has lived and has family ties; (3) his nickname Bear, which is defendant's known nickname; and (4) his phone model, an Android ZTE, which is one of the phones defendant had when he was arrested. These messages also tend to identify defendant through the same modus operandi he used with victim A.C., including using the Little Brother Ruse, sending a photograph of himself at a lake (the same photograph he sent victim A.C.), and using

similar phrases, such as "I might be naughty but I'm always kind" and "Online I am a bit naughty I enjoy exchanging private pictures and videos."

Second, the four messages probative of defendant's intent, motive, knowledge, absence of mistake, preparation, and plan, show that defendant (1) admitted his sexual interest in minors; (2) attempted to entice victims to produce CSAM after they told him they were minors; (3) screened for parental supervision; (4) encouraged minors to delete messages after their conversation; and (4) used the same scheme and keys phrases repeatedly to lure minors (e.g., "I won't disturb ya," "I'm naughty but never rude," "Naughty thoughts. Shame on me," and "Get naked with me. Cum take a bath with me."). The jury cannot ascertain defendant's *pattern* through one chat; it must see a few examples of defendant's repeated tactics to understand his intent, motive, knowledge, absence of mistake, preparation, and plan in communicating with victim A.C. Limiting the government to four examples of this intent evidence – only .06 percent of the 6,013 contacts on the "itsben6969" account – mitigates the risk of any unfair prejudice.

## V.   ELEMENTS OF OFFENSES

The elements of these offenses, which are agreed-upon by the parties, are set forth as follows.  For the purposes of this Trial Memorandum, the parties are not including the definition of certain terms, although those are included in the Joint Jury Instructions.

### A.   Sexual Exploitation of a Child (Count One)

First, at the time, victim A.C. was under the age of eighteen years;

Second, the defendant employed, used, persuaded, or coerced victim A.C. to take part in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and

Third, the defendant knew or had reason to know that the visual depiction would be mailed or transported across state lines, or the visual depiction was mailed or actually transported across state lines, or the visual depiction affected interstate commerce.

**B.     Enticement to Produce Child Pornography (Count Two)**

First, beginning no later than December 30, 2019 and continuing to on or around December 31, 2019, the defendant used a means or facility of interstate commerce, that is the Internet, to knowingly persuade, induce, entice, or coerce an individual, specifically a 10 year-old minor girl, A.C., to engage in production of child pornography, in violation of Title 18, United States Code, Section 2251(a);

Second, the individual was under the age of 18; and

Third, based on the sexual activity that occurred, defendant could have been charged with production of child pornography, in violation of Title 18, United States Code, Section 2251(a).

**C.     Receipt of Child Pornography (Count Three)**

First, that the defendant knowingly received items of child pornography, as alleged in the indictment;

Second, that the items of child pornography had been shipped or in or affecting interstate by any means, including by computer; and

Third, that when the defendant received the items, the defendant knew the items were child pornography.

**VI.    LEGAL AND EVIDENTIARY ISSUES**

The government and the defense met and conferred on these issues, in person, on April 28, 2022.

**A.     Business Records**

At trial, the government anticipates offering records from Instagram, as well as Frontier and Verizon regarding the various IP addresses associated with the Accounts and the internet service provided at defendant's home.  The government intends to establish the authenticity of these materials through signed declarations, which meet the requirements of Fed. R. Evid. 902(11).  That rule identifies certain categories of documents which are self-authenticating, including:

8

The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record--

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

During the meet and confer process, the defense said they were not planning to object to the admissibility of such records on authentication grounds.

**B.     Public Records**

The government intends to introduce a copy of victim A.C.'s birth certificate, which is admissible under Federal Rule of Evidence 803(8) and 803(9), as well as through victim A.C.'s mom, who has personal knowledge.

During the meet and confer process, the defense stated it would not object but also offered to stipulate to victim A.C.'s age as well as that the photographs at issue depict a 10-year old girl, victim A.C.  On May 2, the government told the defense it would not agree to such a stipulation.

**C.     Expert Testimony**

The government previously provided notice pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), that it intends to call as expert witnesses (1) a forensic examiner; and (2) a grooming expert (whom the defense has objected to and is subject to a pending motion *in limine*).  (Dkt. No. 42.)

As this Court knows, a qualified expert witness may provide opinion testimony on the issue in question if specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue.  See Fed. R. Evid. 702.  To be admissible, expert testimony must satisfy only two basic requirements: (1) the testimony must be

9

1    helpful to the trier of fact; and (2) the witness must be qualified to deliver the testimony

2    based on his knowledge, skill, experience, training, or education.  Exum v. General Elec.

3    Co., 819 F.2d 1158, 1163 (D.C. Cir. 1987); 4 Weinstein & Berger, WEINSTEIN'S

4    FEDERAL EVIDENCE, § 702.06[2], at 702-06 (2d ed. 1997) ("WEINSTEIN").  An

5    expert may provide opinion testimony even if it embraces an ultimate issue to be decided

6    by the trier of fact.  See Fed. R. Evid. 704; United States v. Fleischman, 684 F.2d 1329,

7    1335 (9th Cir. 1982).

8        **D.      Defendant's Statements**

9            The government intends to introduce portions of defendant's recorded statements

10   to law enforcement on May 27, 2020, the day the search warrant was executed at his

11   home.

12           Under Rule 801(d)(2)(A), a defendant's prior statement is admissible only if

13   offered against him; a defendant may not elicit his own prior statements, either through

14   defense witnesses or by cross-examination of government witnesses.  See United States

15   v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (stating that "self inculpatory statements,

16   when offered by the government, are admissions by a party-opponent and are therefore

17   not hearsay," but that "non-self-inculpatory statements are inadmissible hearsay").  To

18   permit otherwise would place a defendant's statements "before the jury without

19   subjecting himself to cross examination, precisely what the hearsay rule forbids."  Id.

20   (district court properly granted the government's motion in limine to exclude introducing

21   defendant's post-arrest statements through cross-examination of INS agent) (quoting

22   United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988)); United States v.

23   Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999) ("a defendant cannot attempt to

24   introduce an exculpatory statement made at the time of his arrest without subjecting

25   himself to cross examination").

26           Moreover, the government may introduce selected portions of defendant's prior

27   statements and by doing so, does not, under the rule of completeness, open the door to

28   admission of defendant's entire prior statement by doing so.  In fact, Rule 106 may not

10

1    be invoked by a defendant to require the government to introduce other portions of

2    documents or recordings simply because defendant would like them to be introduced

3    during the government's case.  See United States v. Collicott, 92 F.3d 973, 983 (9th Cir.

4    1996) ("adverse parties are not entitled to offer additional segments just because they are

5    there and the proponent has not offered them") (citation omitted); see also Ortega, 203

6    F.3d at 682 (non-self-inculpatory statements, even if made contemporaneously with

7    other self-inculpatory statements, are inadmissible hearsay; rule of completeness does

8    not allow for admission of inadmissible hearsay); United States v. Weisman, 624 F.2d

9    1118, 1128-29 (2d Cir. 1980) ("At trial, Weisman requested the district court, pursuant

10   to Federal Rule of Evidence 106, to compel the government to play in their entirety

11   tapes, portions of which the government intended to use. . . .  The district court denied

12   both requests.  He concluded that Rule 106 did not require the government to play tapes

13   in their entirety if the omitted portions were not 'necessary to clarify, or make not

14   misleading, that which is introduced.' . . .  We find the district court's ruling . . . to be

15   well within the discretion necessarily exercised by a trial judge. . . .") *abrogated on other*

16   *grounds*, Ianniello v. United States, 100 F.3d 59 (2nd Cir. 1993).

17       **E.      Cross-Examination of Defendant**

18       A defendant who testifies at trial may be cross-examined as to all matters

19   reasonably related to the issues he or she puts in dispute during direct examination.  "A

20   defendant has no right to avoid cross-examination on matters which call into question his

21   claim of innocence."  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir.

22   1981).  The government is not required to provide notice of matters about which it may

23   seek to cross-examine defense witnesses, including defendant, should they testify.

24       **F.      Use of Exhibits During Opening Statement**

25       Exhibits may be used by the government in the opening statement, and so long as

26   the opening statement "avoids references to matters that cannot be proved or would be

27   inadmissible, there can be no error, much less prejudicial error."  United States v. De

28

11

1   Peri, 77826 F.2d 963, 979 (3d Cir. 1985); see also United States v. Rubino, 43127 F.2d

2   284, 290 (6th Cir. 1970).

3     The parties agreed to identify any exhibits that it plans to use in their respective

4   opening statements, prior to trial.

5     **G.  Summary Charts**

6     The government may offer summary charts, including a chart summarizing the

7   voluminous records showing the IP addresses used to access the "itsben6969" account.

8   Fed. R. Evid. 1006 provides that:

9       The proponent may use a summary, chart, or calculation

10       to prove the content of voluminous writings, recordings,
    or photographs that cannot be conveniently examined in

11       court.  The proponent must make the originals or
    duplicates available for examination or copying, or

12       both, by other parties at a reasonable time and place.

13       And the court may order the proponent to produce them
    in court.

14

15     The Advisory Committee Notes to Rule 1006 add that:  "The admission of

16   summaries of voluminous books, records, or documents offers the only practicable

17   means of making their contents available to judge and jury.  The rule recognized this

18   practice, with appropriate safeguards."

19     A chart or summary may be admitted as evidence where the proponent establishes

20   that the underlying documents are voluminous, admissible and available for inspection.

21   See United States v. Meyers, 847 F.2d 1408, 1411-412 (9th Cir. 1988); United States v.

22   Johnson, 594 F.2d 1253, 1255-257 (9th Cir. 1979).  While the underlying documents

23   must be "admissible," they need not be "admitted."  See Meyers, 847 F.2d at 1412;

24   Johnson, 594 F.2d at 1257 n.6.

25     Summary charts need not contain the defendant's version of the evidence and may

26   be given to the jury while a government witness testifies concerning them.  See United

27   States v. Radseck, 718 F.2d 233, 239 (7th Cir. 1983); Barsky v. United States, 339 F.2d

28   180, 181 (9th Cir. 1964).

1    In addition, summary charts are admissible under Federal Rule of Evidence

2    611(a), which permits a court to "exercise reasonable control over the mode and order of

3    examining witnesses and presenting evidence so as to: (1) make those procedures

4    effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses

5    from harassment or undue embarrassment."  Fed. R. Evid. 611(a); see United States v.

6    Gardner, 611 F.2d 770, 776 (9th Cir. 1980).

7    A summary witness may properly testify about, and use a chart to summarize,

8    evidence that has already been admitted.  The court and jury are entitled to have a

9    witness "organize and evaluate evidence which is factually complex and fragmentally

10   revealed."  United States v. Shirley, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's

11   testimony regarding her review of various telephone records, rental receipts, and other

12   previously offered testimony held to be proper summary evidence, as it helped jury

13   organize and evaluate evidence; summary charts properly admitted); United States v.

14   Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983).

15   A summary witness may rely on the analysis of others where she has sufficient

16   experience to judge another person's work and incorporate as her own the fact of his or

17   her expertise.  The use of other persons in the preparation of summary evidence goes to

18   its weight, not its admissibility.  United States v. Soulard, 730 F.2d 1292, 1299 (9th Cir.

19   1984); see Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co., 466 F.2d

20   722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who assisted in the

21   preparation of the original records or the summaries be brought to the witness stand.").

22   During the meet and confer process, the defense asked to see the summary charts

23   before they were used.  The government agreed.  The parties will raise any issues with

24   the Court in advance of the witness being called.

25   **H.    Photographs**

26   At trial, the government intends to introduce photographs from the execution of

27   the search warrant as well as photographs of various digital devices.  Photographs are

28   generally admissible as evidence.  United States v. Stearns, 550 F.2d 1167, 1171-72 (9th

1 Cir. 1977) (photographs of crime scene admissible). Photographs should be admitted so

2 long as they fairly and accurately represent the event or object in question. United States

3 v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978). The Ninth Circuit has held that

4 "[p]hotographs are admissible as substantive as well as illustrative evidence." United

5 States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).

6        In particular, as it relates to child sex abuse material, the parties agreed to the

7 following procedure (subject to the Court's approval): the materials will be placed in

8 folders separate from the other exhibits, and stay in the custody of the agent during the

9 trial (as any other contraband would, such as firearms or drugs). The government will

10 then pass out binders to the Court, to defense counsel, and to the witness, as needed, and

11 display such images on the screen, as needed. Should any member of the jury wish to

12 review the child sex abuse material during deliberation, the government can make them

13 available for inspection in open court.

14     **I.**     **Authentication, Identification, and Chain of Custody**

15        The government also intends to introduce at trial defendant's iPhone, and one

16 laptop (Toshiba) that were seized from defendant's residence and later found to remnants

17 relating to the charged offenses. Fed. R. Evid. 901(a) provides that "the requirement of

18 authentication or identification as a condition precedent to admissibility is satisfied by

19 evidence sufficient to support a finding that the matter in question is what its proponent

20 claims."

21        Rule 901(a) only requires the government to make a prima facie showing of

22 authenticity or identification "so that a reasonable juror could find in favor of

23 authenticity or identification." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th

24 Cir. 1991); United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989); United

25 States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985). Once the government meets this

26 burden, "the credibility or probative force of the evidence offered is, ultimately, an issue

27 for the jury." Black, 767 F.2d at 1342.

28

In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence.  Reyes v. United States, 383 F.2d 734 (9th Cir. 1967); Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960).  Moreover, a presumption of regularity exists in the handling of exhibits by public officials.  United States v. Kaiser, 660 F.2d 724, 733 (9th Cir. 1981); United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991).  Gaps or defects in chain of custody go to the weight of the evidence rather than its admissibility.  United States v. Matta-Ballesteros, 71 F.3d 754, 769 (9th Cir. 1995).

## I.      Reciprocal Discovery

The government has, on numerous occasions, requested reciprocal discovery and expert disclosures from the defense.  To date, defense counsel has not produced any reciprocal discovery. To the extent defendant attempts to introduce or use documents at trial that have not been previously produced, or to use undisclosed experts, the government reserves the right to seek to preclude their use.  See Fed. R. Crim. P. 16(d)(2) ("[T]he court may . . . prohibit the party from introducing evidence not disclosed."); see also Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery requests before trial justified exclusion of unproduced evidence).

The defense stated that it will honor its reciprocal discovery obligations.

## J.      Affirmative Defenses

Defendant has not given notice of an intent to rely on any defense of mental incapacity, duress, entrapment, or alibi.  Therefore, to the extent defendant may attempt to rely on any such defense, the government reserves the right to object and to seek to have defendant precluded from asserting such a defense.

## K.      Character and Impeachment Evidence

Federal Rule of Evidence 405(a) sets forth the sole methods for which character evidence may be introduced.  It specifically states that, where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation and

15

1   (2) by testimony as to opinion.  Thus, a defendant may not introduce specific instances

2   of his or her good conduct through the testimony of others.  See Michelson v. United

3   States, 335 U.S. 469, 477 (1948).  On cross-examination of a defendant's character

4   witness, however, the government may inquire into specific instances of a defendant's

5   past conduct relevant to the character trait at issue.  See Fed. R. Evid. 405(a).  In

6   particular, a defendant's character witnesses may be cross-examined about their

7   knowledge of the defendant's past crimes, wrongful acts, and arrests.  See Michelson,

8   335 U.S. at

9          The defense stated that it does not intend to call character witnesses at this point.

10          **L.     Jury Nullification**

11          This is the subject of a pending motion, which the Court already granted in part.

12   The government continues to object to nullification evidence concerning defendant's

13   health and the subjects set forth in the government's motion in *limine*.

14          To the extent the defendant attempts to raise improper defenses, the Court should

15   exclude any evidence or argument relating to any possible jury nullification defense.  Zal

16   v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a

17   defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a

18   legal defense to, or an element of, the crime charged.  Verdicts must be based on the law

19   and the evidence, not on jury nullification as urged by either litigant.").  In particular, the

20   defendant should not be permitted to introduce evidence concerning his health, his

21   cancer diagnosis, or his limitations due to his condition or diagnosis, since none is

22   relevant to any material issue and its nonexistent or minimal probative value is

23   substantially outweighed by the risk of unfair prejudice and confusion of the issues.  See

24   Fed. R. Evid. 401, 403.

25          **M.     Demonstratives**

26          The parties discussed the use of demonstratives, in particular the use of

27   demonstrative slides with the government's forensic expert to explain the examination

28   process and the software used, for which the defense has the actual extraction reports.

16

1   The government does not intend to admit such slides as actual evidence but just to aid

2   the jury in understanding the various steps of forensic examination, the different types of

3   data that can be extracted, and their significance.

4         During the meet and confer process, the defense asked to see the demonstrative

5   slides before they were used.  The government agreed.  The parties will raise any issues

6   with the Court in advance of the witness being called.

7         **N.    Exhibit List**

8         The Court's Standing Order requires the Trial Memorandum to include "defense

9   exhibits to the extent the defense does not object to disclosure."

10        The defense confirmed that it was not prepared to identify any exhibits at the time

11   of the meet and confer meeting.

12        **O.    Witness List**

13        The Court's Standing Order requires the Trial Memorandum to include "all

14   potential witnesses, as it will be read to the jury panel" and that if the defense objects to

15   identifying someone, it needs to "raised (ex parte if necessary) at the PTC."

16        The defense confirmed that it was not prepared to identify witnesses at the time of

17   the meet and confer meeting but would disclose the names of witnesses (if any) the

18   morning of voir dire.

19   **VII.   CONCLUSION**

20        The government respectfully requests permission to file supplemental trial

21   memoranda if necessary.

22

23

24

25

26

27

28